# Wytheville

## INTERNATIONAL BROTHERHOOD OF BOILER-MAKERS, ETC. V. B. L. WOOD.

June 14, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Chinn, JJ.

518

The opinion states the case.

*Robert F. McMurran,* for the plaintiff in error.

*John C. Davis* and *S. M. Brandt,* for the defendant in error.

Epes, J., delivered the opinion of the court.

This is an action instituted by a notice of motion for judgment. It was brought by B. L. Wood against the International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America (an unincorporated association or order), which we shall hereafter refer to as the International Brotherhood, and the American National Insurance Company (a foreign corporation) as joint defendants.

The International Brotherhood filed a plea in abatement to which the plaintiff demurred, and the court sustained the demurrer.

No formal pleas in bar appear to have been filed by either defendant, but they filed their grounds of defense

which were sufficient to put in issue all the defenses which were interposed by the instructions, and to raise all the questions which are raised in the assignments of error here made.

The court instructed the jury that there could be no recovery against the American National Insurance Company, and there was no verdict or judgment against it. There is no assignment of error or cross-error on this score, and we are here concerned with this action only as an action against the International Brotherhood.

The jury returned a verdict against the International Brotherhood for $500. On the motion of the plaintiff the court set the verdict aside and entered judgment for the plaintiff against the International Brotherhood for $1,000. To this judgment the International Brotherhood assigns error.

The notice of motion for judgment is drawn in conformity with section 6094, Code Va. 1919, relating to declarations on an insurance policy. It alleges that "on the 30th day of September, 1931, the undersigned (i. e., the plaintiff) contracted an incurable disease known as 'Hodgkin's disease,' and as a direct and proximate result thereof he has suffered a total and permanent disability and by reason thereof * * * cannot perform his daily occupation;" that he is a member of the International Brotherhood, and that by virtue of the contract of insurance between the International Brotherhood and the plaintiff, which is contained in the constitution and by-laws he is entitled to recover of it for such total and permanent disability $1,000. A full and complete copy of the constitution and by-laws is filed with and made a part of the notice of motion for judgment.

This copy shows on its face that it is a copy of the constitution and by-laws as revised and adopted by the convention of the International Brotherhood which met in September, 1930. But the case has been proceeded with both here and in the court below upon the assumption that, in so far as it is pertinent to this case, the provisions

thereof have remained the same from prior to the time that Wood claims to have been reinstated to membership in 1926; and we accept this as having been admitted.

The first assignment of error is that the court erred in sustaining plaintiff's demurrer to the International Brotherhood's plea in abatement. This assignment of error is not well made.

The original return of the city sergeant as to service of the notice of motion for judgment on the International Brotherhood read:

"Executed in the city of Portsmouth, Virginia, this 6th day of May, 1932, by delivering a copy of the within notice of motion to C. P. Houston in person, who is the president of the within-named defendant corporation, Local 178— International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America, in which city an office of the said corporation is located."

The International Brotherhood appeared specially and moved the court to quash this return. The court sustained the motion, but permitted the city sergeant to amend his return to read:

"Executed in the city of Portsmouth, Virginia, this 6th day of May, 1932, by delivering a copy of the within notice of motion on C. P. Houston in person, who is the president of Local No. 178 and the agent of the within-named defendant unincorporated association."

No motion was made to quash the amended return; but the International Brotherhood filed a plea in abatement, which reads:

"And the said International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America, comes and says that it is an unincorporated association and that this court ought not to have or take any further cognizance of this cause of action for the reason that it has not been served with any process in this case and sets forth as follows:

"That, by section 6058 of the Code of Virginia, process against unincorporated associations must be served upon

an officer or trustee of said association and in this case the return of the officer shows that it was served upon an officer of a subordinate lodge of this association and not upon any officer or trustee of the international lodge. This affiant further sets forth that under the constitution and by-laws of this organization there are subordinate lodges, in addition to the international organization and that under the said constitution and by-laws, the international organization has full control over, insured and takes care of all death and disability benefits and that the subordinate lodges have nothing whatever to do with the same, therefore, suit must be brought against the international organization and not against the subordinate lodge and process must be served upon an officer or trustee of the international organization. This affiant further sets forth that the principal place of business of the said international organization is Kansas City, Kansas, and that its officers and trustees are J. A. Franklin, president, J. N. Davis, assistant president, and Charles F. Scott, secretary and treasurer, and the residence of the said officers is Kansas City, Kansas. Wherefore, this affiant prays whether this court ought to take or have any further cognizance of this action against the International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America."

The plaintiff demurred to this plea, saying, it "is insufficient in law, in that it fails to give the plaintiff a better writ as it fails to show that suit might be instituted against said defendant in any other court in this State;" and the court sustained the demurrer.

■ An unincorporated association or order can be sued as an entity in Virginia only by virtue of section 6058, Code Va. 1919;[1] and when it is sought to sue it as an en-

---

[1] Section 6058: "All unincorporated associations or orders may sue and be sued under the name by which they are commonly known and called, or under which they do business, and judgments and executions against any such association or order shall bind its real and personal property in like manner as if it were incorporated. Process against such association or order may be served on any officer or trustee of such association or order."

tity process or notice can be served upon it only by serving a copy thereof on a person upon whom service is authorized by that section, that is, upon "any officer or trustee of such association or order." Service upon a mere agent of the association or order or upon an officer of a subordinate lodge of the order is not sufficient. See *Grand Lodge B. L. F.* v. *Cramer*, 53 Ill. App. 578.

█ The designation by the constitution, articles of association or by-laws of the order of certain persons as its officers is not conclusive that there are no other officers. If there are other persons whose duties, powers and relationships to the order are those of officers, as distinguished from those of mere agents, they are officers of it within the meaning of section 6058, though they are not designated as officers in its constitution or by-laws. But no presumption or inference that a person is an officer of a grand lodge of such an order arises from the mere fact that he is an officer of a subordinate lodge thereof, and as such is for some purposes an agent of the grand lodge.

██ Had the International Brotherhood made no appearance, the amended return would have been insufficient to support a judgment against it. Had it moved to quash the return on the ground that it failed to show that the notice had been served upon an officer or trustee of the International Brotherhood, the court should have sustained the motion.[2] Then, as this is a proceeding by notice of motion for judgment, the whole proceeding must have been dismissed of necessity, unless the return could be and was amended so as to state that the person upon whom the notice was served was an officer or trustee of the International Brotherhood, and not merely of a subordinate lodge. (See section 6046 [as amended by Acts 1928, ch. 121, p. 531] which provides that a notice of mo-

---

[2] As to when matter for abatement may be taken advantage of by motion to quash a return or dismiss the action, see *Warren* v. *Saunders*, 27 Gratt. (68 Va.) 259; *Lane Bros. & Co.* v. *Bauserman*, 103 Va. 146, 149, 48 S. E. 857, 106 Am. St. Rep. 872; *Hilton & Allen* v. *Consumers' Can Co.*, 103 Va. 255, 48 S. E. 899.

tion for judgment must be returned to the clerk's office within five days after it is served.)   It is the fact of service which gives the court jurisdiction.   The return is merely the evidence of the jurisdictional fact.   If it fails to show the *facts* as to the service it may be amended to show them, but if there has been no service in fact jurisdiction fails.

■ However, the International Brotherhood pursued neither of these courses.   It resorted to a plea in abatement, alleging not merely that the return failed to show that it had been served with process, but that "it had not been served with any process in the case."   Having chosen to attack by plea in abatement not merely the evidence of the service but the fact of service, the defendant must stand on the issue made by his plea and be governed by the rules applicable to such pleas.

■ The plea is defective, not because it does not "show that suit might be instituted against said defendant in any other court in this State," but because it fails to show that no officer or trustee of the International Brotherhood upon whom process could lawfully be served resided in or was to be found in the city of Portsmouth.   (See sections 6050 and 6056, Code Va. 1919.)

■ The rule that a plea in abatement must give the plaintiff a better writ is a general (though not a universal) rule, which is applicable not only to cases in which the plea goes to the jurisdiction of the court over the subject-matter, but also in some cases where the plea is that the court has not acquired jurisdiction of the parties.   It is true, as is contended by the plaintiff in error, that the rule has no application where the action is transitory and the plea shows a state of facts under which there is no court in the Commonwealth which has both jurisdiction of the subject-matter and can by its process acquire jurisdiction of the party sued, because in such cases it is impossible to give the plaintiff a better writ.   See *Deatrick's Adm'r* v. *State Life Ins. Co.,* 107 Va. 602, 59 S. E. 489; *Bank of Bristol* v. *Ashworth,* 122 Va. 170, 94 S. E. 469; *Warren* v. *Saun-*

*ders,* 27 Gratt. (68 Va.) 259. But in the instant case the plea does not come within this exception. The action is evidently brought in the city of Portsmouth on the theory that the cause of action arose there (section 6050, Code Va. 1919). This being the only ground of venue the notice could not be served in any other county or corporation (section 6056). But the plea fails to show that no officer of the International Brotherhood resided in or could be found in the city of Portsmouth.

All that the plea alleges may be true, and yet there may be an officer upon whom process may be served who lives or is to be found in the city of Portsmouth. It merely alleges that the officers of the International Brotherhood are the three persons named in the plea, and that these three persons reside in Kansas City. It does not negative the existence of any other officers; and the copy of the constitution and by-laws filed with and made a part of the notice shows that in addition to the three officers named in the plea there are ten vice-presidents who are officers of the International Brotherhood. It also provides for the appointment of persons to fill a number of other positions of such a nature that the incumbents would possess the characteristics of officers rather than those of mere agents. The ten vice-presidents are not required to live in Kansas City, and the one for the "Gulf and Atlantic section" (which includes Virginia), inferentially is required to live in that section, and for all that the plea shows, that vice-president and perhaps other officers may reside or have offices in the city of Portsmouth. Further than this, the plea alleges only inferentially that C. P. Houston, to whom a copy of the notice was delivered, was not an officer of the International Brotherhood as well as an officer of the local lodge.

Pleas in abatement are not regarded with favor, and in order to discourage them they are required to be drawn with accuracy and precision. The material facts should be directly and positively alleged with certainty. They should not be left to inference or stated merely by

way of recital. *Guarantee Co.* v. *First National Bank,* 95 Va. 480, 28 S. E. 909; *Quarrier* v. *Peabody Ins. Co.,* 10 W. Va. 507, 27 Am. Rep. 582; *Grand Lodge Brotherhood of L. F.* v. *Cramer,* 164 Ill. 9, 45 N. E. 165.

Courts have an inherent right to protect their jurisdictions; and the court in this instance would have been warranted in striking out the plea in abatement had no demurrer been interposed to it.

The facts pertinent to the other assignments of error are as follows:

The constitution and by-laws, a copy of which was introduced in evidence, is an integral whole ordained by the International Brotherhood in convention assembled; but it is divided into two parts. The first part, which relates particularly to the International Brotherhood as a grand lodge, contains fourteen articles, numbered from one to fourteen. The second part, which is entitled "Subordinate Lodge Constitution," contains fifteen articles, numbered from one to fifteen. To distinguish the articles of the two parts in quoting them we shall number articles of the first part with Roman numerals and those of the second part with Arabic numerals. It contains the following provisions and shows the following pertinent facts:

The International Brotherhood is an unincorporated association or order of international scope, whose constitution and by-laws provides for the establishment by it of subordinate lodges which are themselves unincorporated associations. It is a labor union, organized to protect those working at the crafts designated in article 15, section 15 of the constitution and by-laws, and to procure for them better wages and working conditions by the controlled combined action of its membership. Its primary purpose is not the doing of an insurance business, as is the case with an ordinary mutual insurance company; but as an incident of its main purposes it provides a very limited amount of life and disability insurance for those who are members in good standing of it.

The subordinate lodges are integral parts of the International Brotherhood, and they and the persons belonging to them are subject (to use the language of the constitution and by-laws) to the full jurisdiction thereof, legislative, judicial and executive. But each subordinate lodge is itself a distinct entity, which has its own officers, and holds property, has duties, and may incur obligations that are not the property, duties, or obligations of the International Brotherhood.

The constitution and by-laws prescribes what officers a subordinate lodge shall have, how they shall be elected, and their powers as officers of the subordinate lodge; and, in effect, makes the subordinate lodges and their several officers the agents of the International Brotherhood for the admission of persons to membership in it and for some other purposes. But the agency of both the subordinate lodges and of their officers is distinctly a special agency; and the officers of a subordinate lodge are in no sense officers of the International Brotherhood.

The supreme authority (legislative, judicial and executive) of the order is vested in the International Brotherhood in convention assembled, in which the members meet by representation, the members belonging to each subordinate lodge electing one or more representatives according to its size.

The order meets in convention assembled once in three years. When it is not in convention assembled, the full executive and judicial power of the order is vested in its international executive council; but it is expressly provided that the council shall have "executive and judicial powers only." The international executive council is composed of the "international president, assistant president, and all the international vice-presidents."

The requirements for membership in the order, and the provisions for initiation, suspension, withdrawal and reinstatement are found in that portion of the constitution and by-laws entitled "Subordinate Lodge Constitution," and so far as they are here material are quoted below.

"Article 6. Qualifications for membership.—Section 1. An applicant for membership must be a male citizen of some civilized country between the ages of sixteen (16) and seventy (70) years, working at some branch of the trade at the time of making application, as per Article XV, section 15,[3] subordinate lodge constitution. He will be considered a member of this International Brotherhood when his signed application and fee is received and recorded in the office of the international secretary-treasurer. The original application form with signature of applicant thereon and cost of initiation receipt, plus one insurance premium, must be forwarded to the international secretary-treasurer and the initiation receipt issued by the international secretary-treasurer, the remainder of the fee to be retained by the subordinate lodge involved."

"Section 2. All applications for membership to be made on blank furnished for that purpose, signed by applicant, and recommended by a member in good standing and indorsed by two other members who know the candidate, and must be read at a regular stated meeting, and laid over for the next meeting when they will be balloted for."

"Section 3. * * * All applicants must be balloted for, and three black balls may reject any candidate." * * *

"Article 7. Dues and exemptions.—Section 2. Monthly dues shall be fixed by subordinate lodges at not less than one dollar and fifty cents ($1.50) for mechanics and one dollar ($1.00) for helpers and apprentices, plus insurance premium, except for non-participating members."

Article 8 is entitled "Payment of Dues, Suspensions and Reinstatement." Section 1 reads in part: "All dues should be paid monthly in advance. When a member allows his dues, assessments or fines to become two months in arrears he will be suspended from all rights, privileges and benefits of this International Brotherhood." It and sec-

---

[3] This section is merely a list of the occupations which are declared to be branches of the trade. We are not here concerned with it further than to note that when Wood was working as a ship-fitter he was working at a branch of the trade, but when he was at work with the Norfolk Fire Department he was not.

tion 2 then provide for reinstatement fees and other fees which a member must pay who has been delinquent (1) for more than two and not over six months, and (2) for more than six months.

Section 3 reads: "The original application for reinstatement with signature of delinquent thereon and cost of due receipts, due and reinstatement receipts, plus necessary insurance premiums, must be forwarded to the international secretary-treasurer, and the international secretary-treasurer shall issue all receipts necessary in connection with such reinstatement."

"Article 15. Miscellaneous.—Section 8. Should a member desire to withdraw from the International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America for the purpose of going into business or any other occupation outside of the trade of this International Brotherhood, he may be granted a withdrawal card *after* sixty days' time upon payment of all indebtedness standing against him in the subordinate lodge to date by a majority vote of the lodge. Withdrawal card must be deposited in International Brotherhood, when a member holding a withdrawal card returns to work at the trade, by the secretary of subordinate lodge where such member returns to work; if he fails to deposit said card immediately, whether he works in an organized or unorganized shop or city, said withdrawal card stands revoked. After this withdrawal card has been accepted by the international secretary-treasurer's office, he will be entitled to all the benefits and privileges of the International Brotherhood.

"Section 9. Members making application for withdrawal card and desiring to continue insurance must comply with the international constitution and by-laws as per Article XII, section 14."

Nowhere in the constitution and by-laws is it expressly provided that a member who has resigned, dropped out, or otherwise lost his right to membership shall not be eligible to reinstatement unless he is working at some

branch of the trade when he applies for reinstatement in the Brotherhood. But, when the constitution and by-laws are read as a whole in the light of the primary and dominant purposes of the order and its fundamental scheme of organization as they appear therefrom, it is plainly implied that, where a person who has lost his right to membership seeks reinstatement he must make application for and be re-elected to membership as if he had never been a member, and must be working at a branch of the trade at the time he files his application for reinstatement; and we accept it as being so provided.

This is the construction placed on the constitution and by-laws by the officers of the local lodge who were called as witnesses by both parties; there is no evidence which shows that it has ever been otherwise construed; and the only fair inference from Wood's testimony is that this was the construction he placed upon it or understood was placed upon it, when he claims to have been reinstated in 1926. Both in his testimony and in his brief he says, in effect, that when he was reinstated he knew that he was not eligible to be reinstated to membership unless he was then working at some branch of the trade.

Article 13, section 2 of the "subordinate lodge constitution" provides as follows: "Section 2. Any member who shall be found guilty of knowingly obtaining his membership in this International Brotherhood through fraud, which would debar him if known, or of falsely answering questions shall, upon conviction thereof, be suspended. Any member charged as above shall be entitled to a fair and impartial trial."

Article XIV of the first part of the constitution and by-laws which is entitled "Miscellaneous" closes with these two sections:

"Section 5. No order, permit or promise issued by any officer in violation of these by-laws is binding upon the International Brotherhood.

"Section 6. All constitutional provisions contained in

the articles, sections and paragraphs of this International Brotherhood constitution are emphatic and obligatory on all subordinate lodges of this International Brotherhood."

Section 23 of Article 15 (which is entitled "Miscellaneous") of that part of the constitution and by-laws which is entitled "subordinate lodge constitution" reads:

"Section 23. No order, permit or promise issued by any officer in violation of these by-laws is binding upon the International Brotherhood, or subordinate lodges."

The application card filled out by Wood when he asked for reinstatement in 1926 was not introduced in evidence, but the standard form of application for membership prescribed for use by the international executive council, and which is required to be signed by the applicant, was introduced in evidence. This form requires the applicant to fill out blanks stating by whom he is then employed, his "qualifications," and whether he is being "initiated, reinstated, or depositing withdrawal card." Just above the blank for the applicant's signature is printed this statement: "To the best of my knowledge and belief I am in good health, of sound mind, and have no physical ailments that would tend to shorten my life and have truthfully answered the questions set out above. I further agree that I am not to become a member until recorded on the books of the international secretary-treasurer."

The provisions of the constitution and by-laws relating to insurance benefits so far as they are here material, read as follows:

"Article XII. Death and disability benefits.—Section 1. The International Brotherhood will procure or provide benefits for all insured members who were in good standing in the International Brotherhood on the twenty-sixth day of September, 1925, or who subsequently shall become insured members of the International Brotherhood, and who are in good standing on date of their disability or death, as follows: "One thousand ($1,000) dollars upon the death of insured member while in good standing from

whatsoever cause said death may result, and as provided for in sections 3, 4 and 6 of this article.

"Section 2. All members who have attained the age of sixteen (16) years, and who had not reached the age of seventy (70) years at the time of initiation or reinstatement, are eligible and are hereby insured in the sum of one thousand ($1,000) dollars as provided in sections 1, 3, 4 and 6 of this article."

Section 3. (This section relates to double indemnity for death from an accident, and is not pertinent here.)

"Partial disability.—Section 4. Every insured member of the International Brotherhood, who is in good standing on date of disability, shall be entitled to insurance for partial disability without the payment of any additional premium on the following basis, to-wit:

"In the event that said member at, or away from, occupation shall lose the sight of an eye, or the complete loss of the use of a foot or leg, as a result of accident or disease, the sum of five hundred ($500) dollars will be paid to said insured member; and if an insured member at, or away from, occupation shall lose the complete use of either hand or arm as a result of accident or disease, he shall be entitled to receive the sum of eight hundred ($800) dollars.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Total and permanent disability.—Section 6. Every insured member of the International Brotherhood who is in good standing at the time of his total and permanent disability, shall be entitled to receive total and permanent disability insurance if he is disabled as a result of accident or disease, and upon proof of such total and permanent disability he will be entitled to the full sum of one thousand ($1,000) dollars; \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Section 9. \* \* \* Such insurance as provided for in sections 1, 3, 4 and 6 of this article shall be effective only from date of issuance of receipt and insurance certificate

by the international secretary-treasurer. A photostatic copy of such application[4] for insurance shall constitute a part of such insurance certificate and be attached thereto.

"Insurance premiums—How paid.—Section 10. No insurance provided for herein shall become effective until insurance premium, together with dues as provided for in Article VII, section 2, subordinate lodge constitution, has been received and receipt issued by the international secretary-treasurer; and on the first day of each month thereafter, a like sum of not more than one dollar and thirty cents ($1.30) per month per thousand, together with monthly dues so long as he remains a member of the International Brotherhood, and such sums shall be determined by action of the executive council, and said member shall have the right to pay insurance premium at any time up to and including sixty (60) days from the date when the same became due, and during said grace period his insurance shall not lapse.

"Reinstatement.—Section 12. Any member who shall by reason of non-payment of insurance premiums, or the non-payment of dues, fines and assessments provided to be paid in the constitution and by-laws of the International Brotherhood, and who shall have been suspended or expelled for violation of the constitution and by-laws of this International Brotherhood; and who shall thereafter be reinstated, and shall have become a member of the International Brotherhood in good standing, and shall have paid the insurance premium herein provided for, shall be immediately entitled to all the benefits of the insurance herein provided for, as per Article VIII, sections 1 and 2, subordinate lodge constitution."

"Withdrawal cards.—Section 14. Members making application for withdrawal cards as provided for in Article XV, section 8, of this constitution and by-laws, and who

---

[4] It is to be noted, however, that the constitution and by-laws do not prescribe the form of "such application" or what it shall contain.

may desire to continue in force insurance provided for in this article shall make application for such continuance of such insurance to the international secretary-treasurer, at least thirty (30) days prior to the issuance of such withdrawal cards. No withdrawal card shall be issued until such application is in the hands of the international secretary-treasurer and acknowledged, and by the payment to the international secretary-treasurer, one dollar and fifty cents ($1.50) per month per thousand, twenty-five (25) cents of which shall be the property of the subordinate lodge, and such insurance will thereby be kept in force and such member shall be entitled to all the benefits provided for in this article, except that he shall not be entitled to the double indemnity benefit provided for herein, provided such member or members shall be in good standing in the International Brotherhood for at least twelve (12) consecutive months immediately prior to the making of such application for withdrawal card.

"Withdrawal cards will not be accepted for membership until all lapsed insurance premiums are paid to the international secretary-treasurer."

The constitution and by-laws is not explicit as to whether a member holding an unrevoked withdrawal card is given sixty days of grace in which to pay his monthly insurance premiums or not; but the evidence shows that this is the interpretation which has been placed upon it by the officers of the International Brotherhood, and we accept it as being so provided.[5] Nor is it explicit as to whether a member who owes dues which are past due for less than two months is in good standing or not; but a fair and reasonable interpretation of the provisions bearing on this point is that he does not lose his "good standing" unless he owes dues more than two months past due.

The other material evidence is as follows: Wood joined the International Brotherhood through its local lodge No.

---

[5] See *Brotherhood of Railroad Trainmen* v. *Cook* (Tex. Civ. App.) 221 S. W. 1049; *Edwards* v. *Masonic Mut. Life Ass'n*, 86 W. Va. 339, 103 S. E. 454.

178 in 1912, and remained a member until he went into the United States Navy in 1918, when he stopped paying dues, and (to use his language) "dropped out." There is no evidence that he asked for or was granted a withdrawal card.

When he dropped out the constitution and by-laws of the order made no provisions for the payment of death or disability benefits. These provisions seem to have been inserted by amendments made in September, 1925.

On January 1, 1924, Wood became a member of the fire department of the city of Norfolk, and except when on furlough, continued to work as a member of that department until August 20, 1931. While working as a member of the fire department he was not working at a branch of the trade. In 1926 he got a furlough from the fire department, and while on this furlough worked for about three months as a ship-fitter in the Norfolk Navy Yard.

Wood testifies that he got this furlough "around September (1926), I think, I am not sure," and went to work in the Navy Yard, intending to work there permanently; but that the work in the Yard "got bad," and he thought it best to return to his employment with the fire department, which he did after having worked in the Navy Yard "about three months." His testimony is positive that it was during this three months' furlough period that he applied for reinstatement as a member of the Brotherhood through its local lodge No. 178, and was reinstated by it; and he does not claim to have had but the one furlough during 1926. He further testified that he "started to paying insurance premiums in November, 1926."

J. R. Copeland, the secretary of Local Lodge No. 178, was introduced as a witness by the plaintiff. He testified that Wood was reinstated in 1926; that he could not say "offhand" what time in 1926 this was; but that Wood was working in the Navy Yard when he was reinstated.

On the other hand, Captain Sonenwald of the Norfolk fire department, a witness for the defendant, testified

that the records of that department showed that Wood was on furlough from March 4 to July 15, 1926, and was continuously at work with the department from July 16 to the end of that year.

When he was reinstated in 1926 a "mechanics reinstatement and insurance receipt" was given him by the financial secretary of the local lodge, and a carbon copy duplicate thereof was sent to the international secretary-treasurer. The original was not introduced in evidence, but the carbon duplicate was. The imprint of the carbon shows that as first written it was dated, "Portsmouth, Virginia, September 14, 1926," but over "September" there has been written in ink "August." In the margin of the receipt the names of the month are printed and "August" has been punched. This receipt receipts to B. L. Wood for "monthly dues $5.00, insurance premium, $1.30, total $6.30." The evidence offers no explanation of the change in the date as it was originally written; but nowhere in his testimony does Wood claim that the correct date was August.

As has been said, Wood's application for reinstatement was not introduced in evidence, and there is no direct evidence as to what statements he made therein. But in view of his testimony that he was then working in the shipyard at a branch of the trade, it cannot be inferred that he stated therein that he was then working as a member of the Norfolk fire department.

If it be a fact, when Wood applied for and was reinstated to membership in 1926, he was working as a member of the fire department and not as a ship-fitter in the Navy Yard, there is no evidence sufficient to support a verdict predicated upon a finding that any officer of the International Brotherhood or of the local lodge had any knowledge or notice of this fact prior to December 18, 1931.

Within a short time after he was reinstated Wood applied for and was granted a "withdrawal card." The "withdrawal card" was not introduced in evidence; and

the testimony is not clear as to exactly when he applied for it or when it was granted to him. The most definite testimony on these points is that of the secretary of the local lodge (a witness for the plaintiff) who says: "He was reinstated in 1926 and he paid dues to the 1st of October for one month when he was given the withdrawal card."

In 1926 the International Brotherhood took out a blanket policy of insurance for its members in the Chicago National Life Insurance Company, under which each of its members was insured for practically the same benefits that are provided for in the constitution and by-laws of the order, and sent Wood a certificate signed by that insurance company dated November 1, 1926, certifying that he was covered under that blanket policy. This certificate was endorsed "approved by Chas. F. Scott, secretary-treasurer, International Brotherhood."

The blanket policy with the Chicago National Life Insurance Company was later cancelled or allowed to lapse, and a similar blanket policy was then taken out by the International Brotherhood with the American National Insurance Company. On or about July 1, 1929, the International Brotherhood sent Wood a certificate signed by the American National Insurance Company certifying that he was covered under that blanket policy. This certificate also was endorsed "approved by Chas. F. Scott, secretary-treasurer, International Brotherhood."

These certificates were introduced in evidence, but neither of the blanket policies was; and there is no evidence to show that either of the blanket policies was in force at the time Wood claims to have become disabled.

We do not understand that it is contended that Wood failed to pay any monthly dues or insurance premiums that accrued against him from the time he claims to have been reinstated up to and including the month of July, 1931; and accept it as admitted that he did so. Among the receipts signed by the international secretary-treasurer which he introduced in evidence is one dated Au-

gust 17, 1931. It receipts to him for "$1.25 insurance, as insurance premium for the month of July," and bears notation ".25 held by local."

After working as a ship-fitter in the Navy Yard for about three months in 1926, Wood returned to his employment with the Norfolk fire department, and continued to work as a member of that department, except when on furlough, until August 20, 1931.

In December, 1930, and again in June, 1931, he was on furlough for physical disability and under treatment in the United States Marine Hospital at Norfolk. On each occasion the physicians excised one of his lymph glands and, as he admits, on both occasions advised him that he was suffering from Hodgkin's disease. The evidence does not disclose what the doctors told him at these times about the seriousness of the disease, except what may be inferred from the fact that they told him he had it, their testimony that it is an incurable disease, and Wood's answer to the following question:

"Q. Did you know or have any idea of the significance of what they meant when they told you you had Hodgkin's disease? Did you know it was a fatal disease?

"A. No, I didn't know anything about it."

On August 20, 1931, Wood requested leave of absence from the Norfolk fire department without pay until September 5th, which was granted him; and, in the language of Captain Sonenwald, as "according to the city charter a man is entitled to fifteen days' vacation annually, and he was to be retired for physical disability on September 20th, * * * they gave him a furlough from September 5th to 19th, inclusive, and he returned on September 20th." On September 10th the chief of the Norfolk fire department addressed a letter to Wood advising him that the "medical board's examination found you incapacitated for further active duty in this division" and that he would be retired and placed on the pension roll of the department as of September 20, 1931. The medical examining board had found that he had Hodgkin's disease.

On the day he got his furlough, August 20, 1931, Wood returned to work in the United States Navy Yard at Norfolk as a ship-fitter, and, according to his testimony, worked there until September 30, 1931. On that date, or a few days later, he was discharged from the government's employment on the ground that he had Hodgkin's disease and was physically unfit for service.

On cross-examination he testified that when he returned to work in the Navy Yard he did not tell them he had Hodgkin's disease because "he didn't ask me did I have it and I had no business telling him I did;" and that his reason for going back to work there was "I had twenty years in there and I went back to be retired."

There is a sharp conflict in the evidence as to when Wood returned his "withdrawal card" and as to whether he paid any monthly dues after he returned to work in the Navy Yard in August, 1931. His testimony on these points is as follows:

"I turned in my withdrawal card to J. S. Wellener, the financial secretary of local No. 178 three days after I went to work with the Navy Yard, which was on August 20, 1931; and at that time I paid him $3.

"Q. Did he give you a receipt?

"A. No, sir, I gave him $3.00 and he taken the money and does not give you a receipt, and forwards it in, and instead of crediting it to the dues he gives me a receipt for two months in one. I gave him $3.00 and instead of marking it for the local, as I had returned to work, he failed to do that and gave me credit for two months and takes my withdrawal card.

\*　　　\*　　　\*　　　·\*　　　\*　　　\*　　　\*　　　\*

"Q. You were delinquent at that time in your insurance, were you not?

"A. Not as I know of.

"Q. Did you pay any dues to the lodge?

"A. I gave him $3.00 on it and returned to work, and my withdrawal card."

With his testimony Wood filed a receipt dated Kansas

City, Kansas, September 25, 1931, signed by the international secretary-treasurer receipting for $2.50 "as insurance premium for the month of August, September," and showing that fifty cents which had been paid by Wood had been "held by local."

Wood further testified that Wellener "came to me in October with a receipt, after I had received my receipt, and he wanted me to sign a check that he had returned my dues that I had paid after I had applied for my disability. They wanted to get me delinquent, I guess, I don't know what else." But the only dues he claims to have paid after he applied for his disability were paid by him in November, and it is not possible that he was asked in October to sign a check showing that these dues had been returned to him. It is evident that he was speaking of the check which was sent in the letter of December 18, 1931, hereinafter quoted.

Wood says that when he paid the $3.00 to Wellener in September, 1931, he was not delinquent in his insurance premiums so far as he knew. But the uncontradicted evidence is that at that time he had not paid the insurance premiums which had fallen due on August 1 and Septem. 1, 1931, though he had a sixty day grace period from their several due dates in which to pay them. While Wood claims that he paid Wellener the $3.00 as one month's dues to the local lodge, Wellener's testimony that the monthly dues of a member were at that time $3.30 per month is not contradicted or questioned.

Wellener testified as follows: "The insurance premium required to be paid by a person while he holds a withdrawal card is $1.50, twenty-five cents of which is retained by the local lodge and $1.25 of which has to be remitted to the international secretary-treasurer. The membership dues of a member in regular standing is $3.30." (While he does not specifically so state, this appears to include the $1.30 insurance premium which *members* are required to pay.) "Wood returned to work (in the Navy Yard) in August I am told, but I don't know the

exact date. I didn't know he had been working (there) until he told me he had been working there. He did not deposit his withdrawal card until I asked him for it in September. He deposited it with me on September 20th and at the same time paid me $3 insurance, $1.50 each month for August and September, which was in arrears on the 20th day of September, 1931. I remitted $2.50 of this to the international secretary-treasurer and received from him the receipt dated September 25, 1931, which Wood introduced in evidence, and gave it to Wood. When he paid me this $3.00 I told him he would have to give me his withdrawal card, and go down and see the corresponding secretary and fill out a card, an application card, the same as if he was joining over again or being reinstated. If he had filled that out he would not have had any trouble. In November he gave Mr. Copeland, the secretary of the lodge, $1.50 as his insurance premium for October; and Copeland gave it to me. I retained twenty-five cents of it for the local lodge, and remitted $1.25 of it to the international secretary-treasurer. The receipt dated November 24, 1931, signed by the international secretary-treasurer receipting to Wood for $1.25 'as insurance premium for the month of October,' which was introduced in evidence by Wood is the receipt issued for this payment. The $2.50 which the International Brotherhood offered to return to Wood was sent to Copeland. I don't know when it was sent back."

When Wellener received Wood's withdrawal card he did not send it to the international secretary-treasurer. The witness Copeland says with reference to this: "When this trouble arises, instead of sending it in to Kansas City as he is required to do under the constitution, he turned it in to me [Copeland] to file." The evidence does not disclose whether Copeland ever sent it in or not, or that any officer of the International Brotherhood had any knowledge or information that Wood had returned to work at the Navy Yard until (in October, 1931) he filed a claim for disability.

Copeland's testimony and a letter from Copeland to Wood dated December 18, 1931, which was introduced in evidence by Wood, show that on or before October 27, 1931, Wood had filed his claim for the disability benefits here sued for with the International Brotherhood through Copeland; and that when Copeland received from Wood in November the October insurance premium and gave it to Wellener, he had taken up Wood's claim for disability with the international secretary-treasurer and was actively engaged in trying to help him to get it allowed.

The letter of December 18, 1931, from Copeland to Wood, which was written in his official capacity as secretary of the local lodge, reads:

"Dear Sir and Brother:      Re- Disability Claim.

"Am just in receipt of the following letter, the contents of which I am instructed to notify you.

" 'This is to inform you that the claim for disability benefits of B. L. Wood has been disallowed for the following reasons:

" 'Section 8 of Article XV, on page 92 beginning with line 12 and ending with line 21, states: "Withdrawal cards must be deposited in the International Brotherhood, when a member holding a withdrawal card returns to work at the trade, by the secretary of the subordinate lodge where such member works; *if he fails to deposit said card immediately, whether he works in an organized or unorganized shop or city, said withdrawal card stands revoked.'*

" 'In your letter of October 27th you make the following statement:

" ' "At the time he was discharged from the fire department he received a call at the Navy Yard as ship-fitter, and returned to work on August 20, 1931, and worked until September 30, 1931, when he was again examined and discharged."

" 'Our laws which govern membership in this organization, and the insurance carried on that membership, as quoted above, require that a man returning to work at

the trade must deposit his withdrawal card immediately, and upon failure to do so his withdrawal card stands revoked, and his insurance cancelled. Mr. Wood failed to carry out the provisions of the law in this matter and there was no power in the local lodge or the international that would exempt him from this law.

" 'We are, therefore, enclosing a check for $2.50 covering the insurance premiums paid for September and October, after the withdrawal card had automatically been revoked due to the failure on his part to deposit it when he had returned to work at his trade. We ask that you kindly notify former member Wood of this decision.

" 'With kindest personal regards, I am,

" 'Fraterally yours, signed Chas F. Scott.'

"The above needs no further explanation.

"Kindest regards and greetings of the season, I am,

"Yours truly,

"John I. Copeland,

"Secy. Local 178."

The testimony of the physicians (all of whom were introduced by the plaintiff) is that Hodgkin's disease is a disease of the lymphatic glands, which so far as medical science knows, is incurable and results in death in from a month to seven years after it is discovered that the patient has it. During the progress of the disease the patient grows gradually worse and even after it has progressed for some time there may be periods during which it seems to be arrested and the patient is able to do some work. Dr. Holland, upon whose recommendation Wood was discharged from the Navy Yard testified that he "considered it rendered him unfit for employment" and "unsafe for work at his usual employment." No evidence was introduced as to what had been Wood's actual state of health since he was discharged from the Navy Yard. The record is wholly silent on this point.

The court gave only three instructions, 1-P given at the request of the plaintiff, 3-D given at the request of

the American National Insurance Company, and 4-D given at the request of the International Brotherhood. As originally offered instruction 1-P did not contain the words which we italicize in quoting it. These words were added by the court of its own motion, but without objection from the plaintiff or either of the defendants. These instructions as given read:

"1-P. The court instructs the jury that if you believe from the evidence that the plaintiff is entitled to recover of the defendants, either one or both of them, then you should find for the plaintiff against either one or both of them, for such sum of money as you consider that he is justly and fairly entitled to under the certificate of insurance in this case, *that is, if the disability was partial, the sum of $500, if total, then the sum of $1,000.*"

"3-D. The court instructs the jury that there can be no recovery in this case by the plaintiff against the American National Insurance Company of Galveston, Texas."

"4-D. The court instructs the jury that the constitution and by-laws of the International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America form the basis of the plaintiff's claim in this case, and the plaintiff must prove by a preponderance of the evidence that he complied and conformed to all the by-laws of the constitution of the said order, and if the plaintiff failed to comply with the same, you must find for the defendant."

There were three instructions for which the International Brotherhood asked which the court refused to give. They read:

"1-D. The court instructs the jury that if they believe from the evidence that the plaintiff in this case returned to work in the Navy Yard, Portsmouth, Virginia, as a ship-fitter, the 20th day of August, 1931, and failed to immediately deposit with the secretary of the brotherhood his withdrawal card and to pay his dues and assessments to the lodge as required by the constitution and by-laws,

then he cannot recover in this action and you must find for the defendant."

"2-D. The court instructs the jury that in order for the plaintiff in this action to recover, he must prove by a preponderance of the evidence that he was a member in good standing in the International Brotherhood of Boiler-Makers, Iron Ship-builders, Welders and Helpers of America, that is to say, that when he returned to work as a ship-fitter in the Navy Yard on the 20th day of August, 1931, he immediately deposited his withdrawal card with the secretary of the order and paid two months' dues in said lodge, together with all insurance premiums, and if you believe from the evidence that the plaintiff returned to work as a ship-fitter on August 20, 1931, and failed to deposit his withdrawal card with the secretary or failed to pay two months' dues to the lodge in addition to the insurance premiums, then the court tells you that it is your duty to find for the defendants."

"5-D. The court instructs the jury that if they believe from the evidence that the plaintiff was not working at some trade or calling permitted by the constitution and by-laws of the Brotherhood at the time of his reinstatement into the lodge in 1926, he was not eligible for membership into the lodge and therefore his reinstatement is void, and he is not a member in good standing and is not therefore entitled to any insurance benefits."

The jury returned the following verdict: "We, the jury, find for the plaintiff against the International Brotherhood of Boiler-Makers, Iron Ship-builders and Helpers of America, and fix the damages at $500."

The defendant moved the court to set aside the verdict of the jury upon the ground that the same was contrary to the law and the evidence, and for granting and refusing instructions, and the plaintiff moved the court to set aside the verdict of the jury and enter judgment for the plaintiff for the sum of $1,000. The court overruled the motion of the defendant, but sustained the motion of the plaintiff, set aside the verdict, and entered judgment for

the plaintiff for $1,000 against the International Brother-
hood, saying nothing about the American National Insur-
ance Company.

We shall consider the assignments of error in an order
different from that in which they are assigned in the peti-
tion for a writ of error, but number them as they are
therein numbered.

The fifth assignment of error is that the court erred
in not giving instruction 5-D. This assignment of error
is well made.

If the testimony of Captain Sonenwald is to be believed,
Wood was not working at a branch of the trade at the
time he applied for reinstatement to membership or was
reinstated by the local lodge in 1926; nor did he go back
to work at any branch of the trade from July, 1926, until
after he had become disabled in 1931.

The only persons who are entitled under the constitu-
tion and by-laws to insurance benefits are (1) members
in good standing in the Brotherhood,[6] and (2) persons
holding an unrevoked withdrawal card granted to them
after they have been "members in good standing for at
least twelve (12) months immediately prior to the making
of such application for withdrawal card."

The inception of and continuance of the right to insur-
ance benefits is purely incidental to membership and
flows from it. In this respect the insurance contract here
under consideration is essentially different from that of
an ordinary mutual insurance company, and correspond-
ingly different rules apply to it. In the ordinary mutual
insurance company membership is acquired by taking
out an insurance policy and is an incident of the insurance
instead of the insurance being an incident of member-
ship.

The constitution and by-laws limits the persons who
may become members of or reinstated to membership in
the International Brotherhood to those who are working

---

[6] There are provisions for insuring relations of members of the
Brotherhood; but we are not here concerned with these provisions.

at some branch of the trade when they apply for initiation or reinstatement.

A person applying for membership in a fraternal benefit association is charged with the duty of acquainting himself with its constitution and by-laws; and, in the absence of fraud, is conclusively presumed to know the qualifications for membership therein prescribed and the limitations thereby imposed upon the power and authority of its officers, and upon its subordinate lodges and their officers as its agents. The same rule, of course, applies to persons who have become members. 1 Bacon on Ben. Societies and Ins. (2d Ed.) section 157; *Kennard* v. *Travelers' Prot. Ass'n,* 157 Va. 153, 157, 160 S. E. 38; *Bixler* v. *Modern Woodmen of America,* 112 Va. 678, 72 S. E. 704, 38 L. R. A. (N.S.) 571; *Woodmen of World* v. *Hall,* 104 Ark. 538, 148 S. W. 526, 41 L. R. A. (N.S.) 517. The doctrine of authority implied from ostensible authority has a very limited application as between such an order and a person who is seeking membership in or claims to be a member of it.

The provision limiting those eligible to membership to those who are working at some branch of the trade when they apply for membership, is one of the most fundamental provisions in the constitution and by-laws of the International Brotherhood. It stands as a specific limitation upon the power and authority of its officers and/or subordinate lodges in acting as its agents in admitting and reinstating persons to membership. The very purpose of putting it into the constitution and by-laws was to make certain that it could not be changed except by the International Brotherhood in convention assembled, and that no officer, agent, or subordinate lodge should have or exercise the authority to admit or reinstate any person to membership who was not working at a branch of the trade when he applied for initiation or reinstatement.

It is a provision with which Wood was charged with

knowledge and of which he is shown to have known by his own testimony.

No provision in the constitution and by-laws either expressly or impliedly gives any board, officer, agent, or subordinate lodge the power to waive this provision; nor does it give them or any of them a power or authority which ostensibly empowers them or any of them to waive it.

The fact that the executive council is given full *executive* and *judicial* powers when the Brotherhood is not in convention assembled, and the officers and subordinate lodges are made the agents of the Brotherhood for the purpose of admitting to membership persons who possess the constitutional qualifications, does not give them or any of them the ostensible power to waive the fundamental qualifications prescribed by the constitution and by-laws for admission to membership. To hold that the executive council, or any officer, or subordinate lodge has the authority to do so, would be to permit the council, or officers or subordinate lodges to exercise the legislative power which the constitution and by-laws makes plain is exclusively reserved to the International Brotherhood in convention assembled, and to suspend or abrogate at will what is perhaps the most fundamental provision of the articles of association entered into between its members. 2 Bacon on Benefit Societies and Life Ins. (3d Ed.) section 434a; *Fitzgerald* v. *Burden Benev. Ass'n,* 69 Hun 532, 23 N. Y. S. 647; *Knights of Columbus* v. *Burrough's Beneficiary,* 107 Va. 671, 60 S. E. 40, 17 L. R. A. (N.S.) 246; *Bixler* v. *Modern Woodmen of America,* 112 Va. 678, 72 S. E. 704, 38 L. R. A. (N.S.) 571, and note; *Supreme Council of Cath. Benev. Legion* v. *Boyle,* 10 Ind. App. 301, 37 N. E. 1105; *Burbank* v. *Boston Police Relief Ass'n,* 144 Mass. 434, 11 N. E. 691; *Tuite* v. *Supreme Forest Woodmen Circle,* 193 Mo. App. 619, 187 S. W. 137; *Royal Highlanders* v. *Scovill,* 66 Neb. 213, 92 N. W. 206, 4 L. R. A. (N.S.) 421, and note. See, also, *Societa Unione, etc.* v. *Leyden,* 225 Mass. 540, 114 N. E. 738, L. R. A. 1917C, 256, and note;

*Sovereign Camp, W. O. W.* v. *Wernette* (Tex. Civ. App.) 216 S. W. 669; *Cromeens* v. *Sov. Camp, W. O. W.*, 208 Mo. App. 11, 233 S. W. 287.

Where the provisions of the constitution and by-laws leave it fairly open to question whether an occupation is one which is within the definition of the trade, or it is fairly open to question whether a person is so engaged at a branch of the trade as to be working at it, the international officers and/or the subordinate lodges are impliedly given the authority to determine these questions. It is an incident of the administrative and judicial powers given them by the constitution and by-laws; and, when such a question has been, in effect, fairly submitted to the appropriate international officer or a subordinate lodge, in the absence of fraud, the International Brotherhood is bound by his or its determination of it. It is bound, however, because it has been determined by an authorized authority that the person has the qualifications prescribed by the organic law, not because there has been a waiver of the qualifications for membership required by the organic law. But in the instant case there is no basis for the application of this principle.

If Wood was not working at some branch of the trade when he applied for and claims to have been reinstated to membership in 1926, he did not then and has not since become a member of the International Brotherhood, and no insurance contract between himself and it has ever come into existence. *Fitzgerald* v. *Burden Benev. Ass'n*, 69 Hun 532, 23 N. Y. S. 647.

The contention of Wood that the International Brotherhood is estopped from setting up this defense is not well made, because there is nothing in the evidence to show that it had any knowledge or notice, until after December 18, 1931, that he was not working at a branch of the trade when he applied for and was granted reinstatement by the local lodge.

The third and fourth assignments of error are that the court erred in refusing to give instructions 1-D

and 2-D. The court did not err in refusing to give these instructions.

Both are imperfect in that they do not define what is meant by "immediately." If Wood returned his withdrawal card within three days after he returned to work, as he testified he did, under the facts of this case he did so "immediately" within the reasonable meaning of that word as used in the constitution and by-laws; but as these instructions are drawn the jury might well have understood that this was not a sufficient compliance with the provisions of the constitution and by-laws.

The court correctly refused to give instruction 1-D for this reason also. It failed to tell the jury what dues and assessments to the lodge were required by the constitution and by-laws, but left it to them to find out, if they could, from a reading of the ninety-nine pages of the constitution and by-laws what dues and assessments, if any, Wood was required to pay to the local lodge when he turned in his withdrawal card. The office of an instruction is to assist the jury in understanding the issues and to tell the jury what is the law applicable thereto, and they should be so drawn.

Instruction 2-D is erroneous also in that it tells the jury that Wood was required by the constitution and by-laws "to pay two months' dues to the lodge in addition to the insurance premiums" when he deposited his withdrawal card. We find no provision in the constitution and by-laws which so requires.

The sixth assignment of error is that the court erred in giving instruction 1-P.

This instruction is plainly erroneous. The court in instruction 3-D correctly told the jury that there could be no recovery against the American National Insurance Company. So far as the International Brotherhood was concerned the right of the plaintiff to recover, if any he has, depends upon its constitution and by-laws and not upon the certificate of insurance issued by the American National Insurance Company which was put in evidence;

and upon a new trial no instruction should be given which can be construed to tell the jury that the plaintiff is entitled to recover against the International Brotherhood on that certificate.

Instruction 1-P is also erroneous in that it tells the jury that there can be a recovery for partial disability under the evidence in this case. The constitution and by-laws of the International Brotherhood provide for payment for partial disability in only a very limited class of cases, and the evidence was not sufficient to bring the plaintiff's disability, if partial, within any of those classes. But it is to be noted that the International Brotherhood did not object to the instruction on this ground.

The second assignment of error is that the court erred in not setting aside the verdict of the jury and entering final judgment for the International Brotherhood because there was no evidence to support a recovery by the plaintiff. This assignment of error is not well made.

The seventh assignment of error is that the court erred when it set aside the verdict on the motion of the plaintiff and entered final judgment for the plaintiff for $1,000, because he had "alleged in his notice of motion for judgment that he was totally and permanently disabled, but the evidence fails to sustain anything but partial disability." This contention of the plaintiff in error is not well made. "Total and permanent disability" is not restrictively defined in the constitution and by-laws as it is in many policies of insurance, and is to be given a reasonable interpretation. The evidence is ample to support a finding of "total and permanent disability" within the meaning of the term as used in the constitution and by-laws.

The judgment of the court will be reversed and the case remanded for a new trial upon all issues.

*Reversed and remanded.*

HUDGINS, J., concurs in results.