## Richmond

### United Brotherhood of Carpenters and Joiners of America v. C. P. Moore.

April 26, 1965.

Record No. 5886.

Present, Eggleston, C. J., and Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

*Beecher E. Stallard*, for the plaintiff in error.

*H. E. Widener, Jr.* and *D. H. Frackelton* (*S. B. Campbell; Widener & Widener; Campbell & Campbell*, on brief), for the defendant in error.

Snead, J., delivered the opinion of the court.

On January 9, 1963, C. P. Moore, plaintiff, instituted an action seeking a judgment for $7500 jointly and severally against United Brotherhood of Carpenters and Joiners of America, hereinafter called Brotherhood, and United Brotherhood of Carpenters and Joiners of

America, Local 2826, hereinafter referred to as Local union. The plaintiff alleged in his motion for judgment, among other things, that he was promised by the Brotherhood and the Local union that if he would engage in a strike against his employer, Universal Moulded Fiber Glass Corporation, hereinafter called Universal, the two labor organizations "would pay to and for him and on his behalf while on strike, all of his necessary bills and payments, including, but not exclusively, rent, food, clothing, house and car payments, utilities, recurring payments of small indebtedness contracted prior to said strike, small loans, reasonable wages for duty on a picket line to be established by defendants, and script for purchases of day to day groceries * * *."

The plaintiff further alleged that he relied upon such promises, left his employment, was on strike from April 11, 1962, until July 19, and fully performed all the duties required of him, but that the Brotherhood and the Local union failed and refused to perform "any of said promises, other than to pay a small part of the bills of plaintiff in the approximate amount of $105.00 and seven weeks' grocery money."

The Brotherhood filed its grounds of defense and also a demurrer which was overruled. The Local union failed to appear or plead to plaintiff's motion. A trial was had and the Brotherhood's motions to strike plaintiff's evidence at the conclusion of plaintiff's evidence and at the conclusion of all the evidence were overruled. The jury returned a verdict for plaintiff in the sum of $330. Whereupon, judgment was entered against the Local union, and a motion of the Brotherhood to set aside the verdict and enter judgment in its favor was taken under advisement. On January 8, 1964, the court overruled the motion and entered judgment for plaintiff against the Brotherhood in accordance with the verdict. We granted the Brotherhood a writ of error.

In its assignments of error the Brotherhood contends that the court erred (1) in overruling its demurrer; (2) in overruling its motions to strike plaintiff's evidence; (3) in overruling its motion to set aside the verdict and enter final judgment on its behalf; (4) in giving and refusing certain instructions; and (5) in admitting certain testimony.

Since plaintiff is fortified with a jury verdict which bears the stamp of approval by the trial judge, he is entitled to have the evidence stated and considered in the light most favorable to him. *Adams* v. *Allen*, 202 Va. 941, 945, 121 S.E. 2d 364.

The record discloses that the Brotherhood is a voluntary, unincorporated association and is a labor organization of international scope with its principal office in the city of Washington, D. C. The rights, powers, obligations and duties of the Brotherhood, the local unions, and the members *inter se* are controlled by a "Constitution and Laws". This document is referred to as the "Bible" of the Brotherhood, and provides, among other things, that the general executive board of the Brotherhood has the power to sanction strikes by local unions and to render financial aid to the members of the local unions to the extent it deems adequate when a strike has been sanctioned. It also provides that the general president has the power to deputize a representative to proceed to the scene of the difficulty when a labor dispute arises to endeavor "to adjust the trouble by negotiation or arbitration".

The plaintiff was a member of the Local union, an organization affiliated with and chartered by the Brotherhood, which was located in Bristol. The Local union was operating under a contract with Universal which was due to expire on March 31, 1962, and it was attempting to negotiate a new contract. As was its custom, it requested the Brotherhood to send down a representative to assist its negotiating committee in obtaining the contract, and the Brotherhood sent A. O. McKinney in compliance with the request.

McKinney had been to Bristol previously for the purpose of handling "some grievances", and he had also helped the Local union negotiate other contracts. The plaintiff claims that McKinney was the *alter ego* of the president of the Brotherhood. His credentials card was signed by the general president of the Brotherhood and it stated that McKinney was his "representative". McKinney's duties included "organizing, negotiating contracts, settling grievances and arbitrations, handling arbitrations and so forth." After his arrival in Bristol he participated in the negotiations between the Local union and Universal prior to the strike. He was in and out of Bristol until sometime after the strike had ended.

The members of the Local union held meetings from time to time at the union hall and discussed the progress of the negotiations. McKinney was present at some of these meetings, and he was questioned by members concerning the financial assistance they would receive from the Brotherhood in the event a strike was called. According to plaintiff, McKinney was present in the union hall on April 6, 1962. By that time a strike vote had already been taken by secret

ballot, and a majority of the members were in favor of striking, although plaintiff had voted not to strike. Plaintiff testified:

"A. On April 16 [6], Mr. McKinney and the negotiating committee come back and they had been in a meeting with the company, and Mr. McKinney said that the company took the attitude that they wasn't going to do anything and we was going to have to come out on a strike to show them that we meant business.

\*    \*    \*    \*    \*    \*    \*

"A. They [the members] asked Mr. McKinney who was going to take care of our bills, and Mr. McKinney said that the local, I mean the international had always took care of the members and they wasn't a quitting now, that they would pay our bills.

\*    \*    \*    \*    \*    \*    \*

"A. At that special meeting, Mr. McKinney said all of our bills would be paid."

Plaintiff further testified that McKinney made it plain that "he was the boss of the thing"; that he would appoint a finance committee "to suit theirselves" for the purpose of disbursing the money to be received from the Brotherhood; "that he would take full responsibility of the money that come in and what was paid out"; that members "would be paid for walking the picket line"; that members were to turn in their bills to the committee, and that all bills would be paid. He also testified that the promise to pay the bills was made before the strike commenced and was renewed several times thereafter.

W. E. Beard, a member of the Local union, substantially corroborated plaintiff's testimony. McKinney denied making the alleged agreement or promises, and other witnesses who were present at the meetings said they never heard such promises made.

Pursuant to the "Constitution and Laws" and with the assistance of McKinney, the Local union filled out and mailed a schedule of inquiries, dated March 30, 1962, to the headquarters of the Brotherhood requesting strike benefits. On April 2, the Brotherhood acknowledged receipt of the schedule, and the general executive board granted official sanction to the Local union's "trade movement." It cautioned the Local union to avoid a strike if possible, but on April 11, T. S. Morrell, vice-president of Universal, addressed the members of the Local union and made an offer of settlement which was not acceptable and the members decided to strike that night.

Approximately 200 members of the Local union went on strike. Plaintiff actively participated in the strike from beginning to end. He

walked the picket line for an hour each day and in addition remained in the area for three hours daily.

According to the president of the Local union, during the course of the strike the Brotherhood rendered financial aid to the Local union in the approximate amount of $44,000. The money was placed in a special bank account by the finance committee of the Local union, which committee plaintiff believed was appointed by McKinney. However, McKinney denied making the appointment and other witnesses stated that the members of the finance committee were appointed by the officers of the Local union. The funds were distributed by the committee according to a formula it adopted based on the number of dependents a member had, and an accounting report complete with receipts was sent each week to the Brotherhood. The record indicates that plaintiff received strike benefits amounting to approximately $300 which were not sufficient to cover all of his bills or expenses incurred.

As the strike continued the Local union on several occasions sent representatives to the Brotherhood's headquarters in an attempt to secure additional funds. Some additional aid was provided, but finally the Brotherhood discontinued payments because the strike "was lost" and as a result, it had to be abandoned. Later, the Local union ceased to exist and its charter was "picked up" by the Brotherhood because the required per capita tax was in arrears for six months. When the strike ended on July 19, 1962, plaintiff's position with Universal had been filled by a permanent replacement, and at the time this action was instituted he had secured employment elsewhere.

The evidence adduced was sufficient to make a jury question of whether the alleged promise was made by McKinney, and the jury by its verdict has resolved that question in favor of plaintiff. Whether McKinney had the authority to bind the Brotherhood is the crucial question presented.

In 31 Am. Jur., Labor, § 33, p. 415, it is stated:

"The articles of agreement of a labor union, whether called a constitution, charter, bylaws, or any other name, constitute a contract between the union and its members, as well as a contract between the members of the union, which the courts will enforce, if not immoral or contrary to public policy or the law of the land. A labor union has the right to make and adopt reasonable bylaws governing the conduct of its own members. So long as the bylaws of a union relate to matters in which no one except the association and its members is interested, and violate no right of a third person and

no rule of public policy, they are valid." See also 87 C.J.S., Trade Unions, § 36, p. 822, *et seq.*

In the frequently cited case of *Amalgamated Clothing Workers v. Kiser*, 174 Va. 229, 6 S.E. 2d 562, the plaintiff, Mrs. Kiser, sought a recovery of defendant, Amalgamated, a labor union which was a voluntary unincorporated association, for breach of contract. The plaintiff claimed that the agents of defendant entered into an oral contract with her whereby if she should lose her employment by reason of joining the defendant union, the union would pay her the salary she was earning at the time of her discharge and continue to pay same until she obtained other employment or until other employment was provided her by the defendant union. The plaintiff joined the union and lost her job as a result thereof. At the time of her discharge she was earning $18 per week. The defendant thereafter, through its agents, paid plaintiff a lesser sum for forty-six weeks at which time she was advised that no future payments would be made. The plaintiff contended that the payments were made under the oral contract, whereas defendant claimed that they were relief payments and were not made under any contract. The jury fixed Mrs. Kiser's damages at $1500 and judgment was entered thereon. On appeal this court reversed the judgment and entered final judgment for defendant. The opinion states in part:

"We have searched the constitution from beginning to end and have found no express authority for the contract. Inferred or implied powers must rest upon some provision in the constitution, for it embodies the association's whole plan of existence. All rights, privileges and duties of both the association and its members must be found in the constitution. We are not permitted to look elsewhere for them.

     \*      \*      \*      \*      \*      \*      \*

"\* \* \* She [Mrs. Kiser] was charged with knowledge of the limited authority of the officers and agents of the defendant. \* \* \* The constitution not only constitutes the contract between a member and the association but it also constitutes the contract between a member or members and other members. *Bradley v. Wilson*, 138 Va. 605, 123 S.E. 273; *Brotherhood of Railroad Trainmen v. Barnhill*, 214 Ala. 565, 108 So. 456, 47 A.L.R. 270; *Cameron v. International Alliance, etc.*, 119 N.J.Eq. 577, 578, 183 A. 157, 161.

     \*      \*      \*      \*      \*      \*      \*

"In *International Brotherhood of Boiler-Makers, etc.* v. *Wood*,

*supra,* [162 Va. 517, 175 S.E. 45] we expressly held that a person who applies for membership in an association of this kind is just as much bound by the constitution and by-laws of the association as a full member. The International Brotherhood was a labor union somewhat similar to the defendant. It was an unincorporated association of international scope. Its powers and duties and the rights of those who applied for membership and its members were expressly defined, prescribed and limited by a constitution and by-laws. At page 552 of the opinion in that case we restated the familiar principle in this language: 'A person applying for membership in a fraternal benefit association is charged with the duty of acquainting himself with its constitution and by-laws; and, in the absence of fraud, is conclusively presumed to know the qualifications for membership therein prescribed and the limitations thereby imposed upon the power and authority of its officers, and upon its subordinate lodges and their officers as its agents. The same rule, of course, applies to persons who have become members. 1 Bacon on Ben. Societies and Ins. (2d Ed.) section 157; *Kennard* v. *Travelers' Prot. Ass'n,* 157 Va. 153, 157, 160 S.E. 38; *Bixler* v. *Modern Woodmen of America,* 112 Va. 678, 72 S.E. 704, 38 L.R.A. (N.S.) 571; *Woodmen of World* v. *Hall,* 104 Ark. 538, 148 S.W. 526, 41 L.R.A. (N.S.) 517.'

"There being no power in the constitution of the defendant authorizing it to enter into the contract with Mrs. Kiser, it could not have been validly made. Mrs. Kiser is bound to have known of the absence of authority in the constitution. The defendant itself not having the power to make the contract, its agents would have no implied authority to do what the principal itself is not empowered to do. * * *" 174 Va. at pp. 235, 236, 237.

Here, the Brotherhood is a voluntary, unincorporated association. The rights, privileges, obligations and duties of the association and its members are found in the "Constitution and Laws". We must look only to this document for McKinney's authority to enter into the alleged oral contract with plaintiff on behalf of the Brotherhood. It is conceded by plaintiff that there is no provision in the constitution which expressly states that the Brotherhood has the power to promise strike benefits, but he contends that references in various places of the constitution to "strike pay" and "strike benefits" indicate the implied power to make such promise of payment.

The record shows that the alleged promise to pay the strike benefits claimed by plaintiff was made by McKinney, who was the representative of the general president of the Brotherhood. The plaintiff de-

scribed him as the *alter ego* of the president. However, if the general president had no authority to make the promise, it must follow that McKinney, acting as his representative, had no such authority.

The benefits paid to the members of the Local union were authorized by the general executive board of the Brotherhood. The Constitution provides that the board may render financial aid to the extent it deems adequate.

It is true that paragraph L of § 59, under the heading "General Strikes and Lock-outs", gives the officers the power to render financial assistance under certain limited circumstances. It reads:

"In case of a strike or lock-out, where immediate aid is required the General President, General Secretary *and* General Treasurer shall be vested with power to appropriate such sums as, in *their judgment*, they deem advisable to meet these particular demands, and until such time as the General Secretary can act upon the same through correspondence with the General Executive Board." (Italics supplied.)

This provision does not give the power to the three officers to act separately. They must act jointly. Thus, the general president, under paragraph L, has no authority alone to render financial aid to the members and we do not think it can be implied that he or his representative, McKinney, could have the authority under it to make an effective promise on behalf of the Brotherhood to pay benefits as claimed by plaintiff.

Moreover, our study of the "Constitution and Laws" fails to reveal any provision whereby it may be reasonably implied that the general president alone had the power or the authority to pay strike benefits or to enter into the alleged oral contract with plaintiff and bind the Brotherhood. That being the case, McKinney, his representative, certainly lacked such authority. Also we find no basis upon which it can be found that McKinney had the implied authority from the general executive board to act.

We hold that the trial court erred in refusing to sustain the Brotherhood's motions to strike plaintiff's evidence on the ground that it was not proved that McKinney had authority to make the promise claimed by plaintiff. In view of this holding it becomes unnecessary to discuss other questions raised by the assignments of error relied upon.

Accordingly, the judgment appealed from is reversed and final judgment is entered for defendant.

*Reversed and final judgment.*