# Wytheville

## AMALGAMATED CLOTHING WORKERS OF AMERICA V. MRS. D. A. KISER.

June 12, 1939.

Reheard January 8, 1940.

Record No. 2081.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

230

*Charles Curry, Walter Brower* and *Norman Kaliski,* for the plaintiff in error.

*Joseph I. Nachman* and *S. D. Timberlake, Jr.,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

The Amalgamated Clothing Workers of America, the defendant in the trial court, who will hereafter be referred to as the defendant, is a labor organization of international scope having a membership of 125,000. It is a voluntary, unincorporated association with its principal office in the city and State of New York. The purpose of the organization is the improvement of conditions of employment in the men's clothing industry in the United States and Canada. The powers of the defendant and its control, as well as the relation between it and its members, are set forth in a comprehensive constitution.

In the later part of 1934, and in the early part of 1935, the defendant, through its agents, attempted to obtain members among the employees of L. Grief Brothers, a men's clothing manufacturer in Staunton, Virginia. Mrs. Kiser, the plaintiff in the court below and who will be so referred to here, was one of the employees of L. Grief Brothers at

their Staunton plant. On or about March 5, 1935, certain employees of L. Grief Brothers who had become interested in the defendant organization were prevented by other employees of that firm from entering the plant. The plaintiff was one of the employees who was denied entrance to her place of work.

The plaintiff claims that the agents of the defendant entered into a contract with her. The substance of the alleged agreement was that should she lose her employment in the plant of L. Grief Brothers by reason of joining the defendant labor union, the union would pay her the salary she was earning at the time of such loss of employment, and would continue to pay the same until she should obtain other employment or until such other employment was provided for her by the union.

The plaintiff claims that she became a member of the union, and on the 5th day of March, 1935, lost her employment because of her membership in this organization. At this time she was earning $18 per week.

From the time that her employment with L. Grief Brothers was terminated and 46 weeks thereafter, the defendant, through its agents, paid the plaintiff the sum of $5 per week until September 1, 1935, and $7.50 per week from that date to January 8, 1936. Upon the later date she was notified that no future payments would be made.

The plaintiff contends that these payments were made under the contract that she claimed to have had with the defendant. The defendant, on the other hand, maintains that the payments were simply relief payments and were not made under any contract.

The proceedings in this case were instituted by filing a petition for an attachment on behalf of Mrs. Kiser. The contract set forth in the petition, the substance of which we have just related, was relied upon as the basis of the plaintiff's action.

The defendant filed an answer in which it offered several affirmative defenses—among them, that no one had authority from the defendant to make the contract alleged by the

plaintiff; that the plaintiff never became a member of the union; that she failed to prosecute her claim within the union as provided by the constitution as a condition precedent to the institution of legal proceedings; that she was conclusively presumed to know the constitution of the defendant; that it contained no authority for the execution of any such contract as that proceeded upon; that the constitution precludes the authority in any person to make such a contract; that the constitution forbids the payment of any moneys without the approval of the General Executive Board of the defendant and no such approval was given; and that the constitution is the contract between the defendant and its members, and the oral contract claimed by the plaintiff tends to vary and contradict the written constitution.

This case came before this court upon a former occasion under the style of *Kiser* v. *Amalgamated Clothing Workers of America,* and the opinion rendered at that time is found in 169 Va. at page 574, 194 S. E. 727, 114 A. L. R. 1291. This court at the former hearing simply reversed the judgment of the trial court in which a demurrer to the petition had been sustained and remanded the case for a trial on the merits.

In the trial upon the merits in the lower court the jury found in favor of the plaintiff and assessed her damages at $1,500. The verdict was approved by the court and its judgment is now before us upon the present writ of error. Fourteen similar cases instituted by other employees of L. Grief Brothers against the defendant alleging a similar contract are now pending in the trial court and await our determination of this case.

A motion to dismiss the writ of error granted in this case has been made. The position taken by counsel for Mrs. Kiser is that it appears that more than four months and fifteen days, excluding the time the petition was being considered by this court, elapsed before the appeal bond was given as is required by the Code, section 6355, as amended by the Acts of 1938, chapter 76, section 1.

From the view we take of the motion it is not necessary for us to decide whether the section prior to the amendment of 1938 applies or whether the statute as amended in 1938 applies, for in any event we think the bond was given before four months and fifteen days elapsed (excluding the time the court held the petition), from the day of final judgment.

The facts are that the judgment was entered on June 1, 1938, which counsel claim was a final case. However, that judgment did not bear interest as is provided by Code, section 6259. The court on June 2, 1938, corrected the former judgment and provided that it should bear interest. The question presented is whether the judgment became final on June 1st or June 2nd.

We are of opinion that the judgment became final on June 2nd. The judgment of June 1st was not a complete and final adjudication, because it did not meet the requirements of the statute. Something remained to be done to finally determine the case in the lower court, namely, ascertain and adjudicate when interest should begin. Until this was done there was no final judgment.

If we compute the time from June 2nd, four months and fifteen days expired on October 17th. The petition was being considered by this court from September 30th until October 11th (twelve days), on which later day the writ was granted. Twelve days added to October 17th would bring the last day to October 29th. On October 29th the bond was given and we think it was in time.

There are a number of assignments of error relied upon, but we think the controlling and determinative question is whether the defendant had the power to enter into the contract alleged. If it did not possess such power then its agents had no authority to make it and its officers could not ratify it.

Counsel for Mrs. Kiser in their brief make the point that authority in the constitution exists for the contract. They say the authority may be inferred or implied from the

powers expressly granted. They also rest their position upon the doctrine of ratification.

For the purposes of a decision of this case we will proceed on the theory that the agents of the defendant actually made the alleged contract with Mrs. Kiser and that the payments made to her were in pursuance thereof.

■ We have searched the constitution from beginning to end and have found no express authority for the contract. Inferred or implied powers must rest upon some provision in the constitution, for it embodies the association's whole plan of existence. All rights, privileges and duties of both the association and its members must be found in the constitution. We are not permitted to look elsewhere for them.

■ ■ We are not unaware of the principle that all acts of an agent in the discharge of his duties and within the scope of his authority, whether that authority is express, implied or apparent, are obligatory upon the principal and no ratification or assent on the latter's part is necessary to give them validity. That rule has no application here because we are considering an association, not formed or existing for profit and one which has very limited powers prescribed in a definite, clear and unambiguous constitution. It is a democratic instrument and affords to all who subscribe, equal rights, privileges and duties. No one is entitled to a greater right or privilege than his brother member. From such an instrument, inferred or implied powers seldom arise as is attested by this apt language in *International Brotherhood of Boiler-Makers, etc.* v. *Wood,* 162 Va. 517, 175 S. E. 45: " * * * The doctrine of authority implied from ostensible authority has a very limited application as between such an order and a person who is seeking membership in or claims to be a member of it."

■ ■ It is needless to observe that the constitution is binding upon Mrs. Kizer. She expressed her desire to become a member of the association by signing the application card in which she authorized the association to represent her in any negotiations with her employer. She instituted the present suit as a member of the organization.

She was charged with knowledge of the limited authority of the officers and agents of the defendant. In fact the court so instructed the jury without objection from her counsel. The constitution not only constitutes the contract between a member and the association but it also constitutes the contract between a member or members and other members. *Bradley* v. *Wilson*, 138 Va. 605, 123 S. E. 273; *Brotherhood of Railroad Trainmen* v. *Barnhill*, 214 Ala. 565, 108 So. 456, 47 A. L. R. 270; *Cameron* v. *International Alliance, etc.*, 119 N. J. Eq. 577, 578, 183 A. 157, 161.

In *Cameron* v. *International Alliance, etc., supra,* the court said: "This association·derives its authority from the contract of membership. The members are bound by the constitution and laws of the society in so far as they do not offend public policy or the law of the land or contravene the fundamental scheme of the society itself. Such laws ordinarily measure the rights and powers, and obligations and duties, between the association and its members, and the latter *inter se.*"

In *International Brotherhood of Boiler-Makers, etc.* v. *Wood, supra,* we expressly held that a person who applies for membership in an association of this kind is just as much bound by the constitution and by-laws of the association as a full member. The International Brotherhood was a labor union somewhat similar to the defendant. It was an unincorporated association of international scope. Its powers and duties and the rights of those who applied for membership and its members were expressly defined, prescribed and limited by a constitution and by-laws. At page 552 of the opinion in that case we restated the familiar principle in this language: "A person applying for membership in a fraternal benefit association is charged with the duty of acquainting himself with its constitution and by-laws; and, in the absence of fraud, is conclusively presumed to know the qualifications for membership therein prescribed and the limitations thereby imposed upon the power and authority of its officers, and upon its subordinate lodges and their officers as its agents. The same rule, of

course, applies to persons who have become members. I Bacon on Ben. Societies and Ins. (2d Ed.) section 157; *Kennard* v. *Travelers' Prot. Ass'n,* 157 Va. 153, 157, 160 S. E. 38; *Bixler* v. *Modern Woodmen of America,* 112 Va. 678, 72 S. E. 704, 38 L. R. A. (N. S.) 571; *Woodmen of World* v. *Hall,* 104 Ark. 538, 148 S. W. 526, 41 L. R. A. (N. S.) 517."

There being no power in the constitution of the defendant authorizing it to enter into the contract with Mrs. Kiser, it could not have been validly made. Mrs. Kiser is bound to have known of the absence of authority in the constitution. The defendant itself not having the power to make the contract, its agents would have no implied authority to do what the principal itself is not empowered to do. This rule also applies to the doctrine of ratification. A contract can only be ratified by the person who had the power to authorize it. Ratification is a substitute for original authority. Here the defendant did not have the power to authorize the contract and consequently had no power to ratify it. 2 Am. Jur., Agency, section 216, page 173.

"An unauthorized act cannot be ratified by a person or body of persons who could not have authorized the act in the first instance." 7 C. J. S., Associations, section 20, page 53.

For these reasons we do not think the amounts paid Mrs. Kiser could be treated as a ratification of the alleged contract.

The principles in *Pulaski and Giles Mutual Insurance Company* v. *Downs,* 165 Va. 106, 181 S. E. 361, are applicable here. There a policy of fire insurance was issued to Mrs. Downs through the agents of the insurance company. There was no authority in the by-laws for the issuance of this particular kind of policy. Mrs. Downs was charged with knowledge of the absence of power in the by-laws to issue her policy and the court so held. It was also held that the by-laws formed a part of her contract with the insurance company as well as a part of her contract with the other members of the association.

In the case at bar the constitution was the contract between Mrs. Kiser and the defendant. It was also the contract between herself and the other members. The fund derived from the other members of the association by way of dues and assessments paid by them was a trust fund. It could not be appropriated and paid out except by virtue of the constitution. If we look beyond the association as an entity, the fund in reality belonged to all members. No one member was entitled to share in benefits that were not to be enjoyed by every other member. To permit Mrs. Kiser to collect her wages of $18 per week from that fund would in effect amount to paying her from a fund belonging to all the members alike without their consent. It would result in the destruction of the principle of equality of benefits which underlies the general plan of the association. There is no provision in the constitution that authorizes the payment of any moneys to Mrs. Kiser.

Provision is made in the constitution for the settlement of claims, grievances and appeals by the General Executive Board and the procedure is outlined. The defendant vigorously asserts that Mrs. Kiser should have exhausted her remedies provided in the constitution for the settlement of her claim before proceeding in the courts. That point is not necessary to a decision of the case since we are of opinion that the defendant had no power to enter into the contract with Mrs. Kiser.

The judgment is reversed and final judgment entered here for the Amalgamated Clothing Workers of America.

*Reversed.*

HOLT, J., dissenting.

As stated in the majority opinion, this is the second review of a judgment in this case. The first involved the legal propriety of the trial court's action in sustaining a demurrer to the plaintiff's petition. In an extended and carefully considered opinion by Mr. Justice Browning, the court reversed that judgment and remanded the case "for a

trial on its merits and in accordance with the views herein expressed." *Kiser* v. *Amalgamated Clothing Workers of America,* 169 Va. 574, 194 S. E. 727, 114 A. L. R. 1291.

That opinion, therefore, in so far as the facts alleged in the petition were concerned, thereby became the law of this case. The decision was definitely to the effect that the facts averred constituted a cause of action against the defendant, and that if those facts were proved by competent evidence on the trial a recovery of damages against the latter would be warranted. Moreover, on the basis of the allegations of the petition the court expressly found and stated in the opinion then rendered that

"The contract, or agreement, in question promises the plaintiff that if she joins defendant's union and loses her position because of such action the union will continue her salary until she is again employed."

Asked on cross-examination how she and her counsel and the other women figured the amount of damages claimed, the plaintiff answered:

"* * * we just figured we had been damaged, greatly damaged when we were thrown out and lost our money, when I spent it well for my four children and family."

Upon a return of the case to the court below, and a trial there upon the merits, a contract such as the one above stated by this court was established by what seems to me to be the overwhelming weight of the evidence. While at the trial there was an earnest effort in behalf of the defendant to show that the promise was conditioned upon the National Industrial Recovery Act, 48 Stat. 195, being upheld, the evidence designed to establish that qualification is, as I read it, very far from being convincing. It is altogether likely that Miss Christenson and Miss Corlett, the two organizers sent to Staunton to set up a local union, had "The N. R. A." and its potent machinery very definitely in mind, and were counting on them as efficient aids in fulfilling the promises made to the employees of Grief Brothers, but the evidence as a whole is to my mind not at all persuasive that anything whatever was said by the organ-

izers at the time that would indicate the promise bore any relationship to, or was dependent for its carrying out upon, the Federal Act.

The business of the organizers was to present the union, as such, and the advantages of membership in it, in their most attractive light, and to convince those who were being solicited to join that the union, in and of itself, was fully competent to protect and to advance the interests of its members. In that connection the financial strength of the head organization appears from the evidence to have been the feature principally stressed, an abundance of funds in banks in New York and Chicago being significantly alluded to, and a witness quoting one of the organizers as saying: "Don't worry about that. In case you lose your job the union will pay you as much as you are making right now; we have lots of money." And the evidence leaves no room for doubt respecting the zeal, persuasive powers or persistence of the soliciting organizers. There is, however, not the slightest indication that they were actuated by any discreditable motive or that they were acting otherwise than in the utmost good faith and in the firm belief that the union would make good on the promise.

Much to be regretted, though, is the fact that there is evidence tending to show that subsequently, and after the attempt to organize a local union had failed, a very reprehensible method was resorted to. One employee who had lost her position at the factory but who for some undisclosed reason did not bring suit, testified that she was asked to sign a paper exonerating the defendant union, and that she was offered $25 to do so but declined "because it was not the truth in that." The paper was introduced in evidence and contains this statement:

"We have never heard Miss Christenson or Mrs. Bishop or any one else say that the Amalgamated Clothing Workers of America will pay to those who join the union the wages the workers earned should they be discharged."

The court, in its present opinion, denies the plaintiff— and in consequence also the fourteen other former employees

of Grief Bros.—any relief, and this on the ground that the constitution of the defendant union contains no provision authorizing the organizers of a local union to make a promise to or a contract with the women such as the evidence shows they did make when the organizers urged them to join.

Viewing the point against the background of what transpired when the case was here before, it takes on the appearance of an afterthought on the part of defendant's counsel. That is to say, counsel had urged a number of grounds in support of the demurrer to the petition: (1) That the contract alleged was too indefinite in its terms to be enforceable, (2) that the plaintiff failed to allege compliance on her part with the constitution and by-laws of the union—evidently meaning as regards the payment of dues and other steps necessary to qualify as a member, (3) that the contract lacked mutuality of obligation; and some seven other grounds. But the ground now urged by counsel, and sustained in the majority opinion, was not even mentioned. That defense made its appearance for the first time in the answer filed by the defendant after the return of the case to the trial court. That the point was not made in the argument on the demurrer, and that the defense then predicated upon the constitution related solely to the provisions of that instrument touching the steps necessary in order to qualify and to continue in good standing as a member, and not to the authority of organizers to make agreements with those solicited, is, I think, clear from the following passage of the former opinion:

"The defendant alleges that the plaintiff fails to aver compliance on her part with the constitution and by-laws of the defendant and the performance of a condition precedent.

"It is not incumbent upon the plaintiff to prove her position in relation to this allegation. Rather, it is defensive matter, to be urged and established by the defendant."

Furthermore, there is certainly a close analogy in this respect between the constitution of a voluntary associa-

tion, like the defendant, and the charter of an ordinary business corporation. Regarding the latter the following is laid down in 7 Ruling Case Law, p. 589:

"It may be stated as a general rule that every corporation has power to make all contracts that are necessary and usual in the course of the business it transacts, as means to enable it to effect such object, unless expressly prohibited by law or the provisions of its charter."

And, referring to the doctrine of *ultra vires*, the same authority, at page 676 of the volume above quoted, says:

"* * * in the modern cases especially, the rule has been frequently announced that the plea of ultra vires should not be allowed to prevail, whether interposed for or against a corporation, when it will not advance justice, but, on the contrary, will accomplish a legal wrong."

So much by way of background. I come now to consider, very briefly, the proposition on its merits.

It is said in the majority opinion that a careful search of the constitution of the defendant union disclosed no provision expressly authorizing such a contract. A diligent search for any express provision in that instrument for sending out from headquarters representatives to organize local unions would be equally fruitless, or even a provision for paying compensation to any member of the large staff— except the General President and the General Secretary-- Treasurer, whose salaries are prescribed—or for contracting for the rent of offices, or for office equipment, etc., and yet hardly will it be questioned that the defendant union has such authority under its constitution. The latter does, however, provide expressly for the organization of local unions throughout the country and prescribes the qualifications necessary for membership.

Although the organization of local unions appears to constitute the chief purpose of the parent body, Miss Christenson testifying as to her own work that "the main job is to organize and try to get people to join the union," nothing very specific is said in the constitution as to the scope of the authority of those who are sent out to engage

in such work. There are, however, certain broad provisions bearing upon the matter; such as in section 6 of Article V, where it is provided that the General President shall, among other things, "perform necessary organizing and other work usual to the office of General President," and in section 12, of the same article, where the language is, "The General Executive Board shall have general supervision over the affairs of the Amalgamated Clothing Workers of America." But, according to Miss Christenson, the organizers of local unions, at least those long in service, are allowed considerable discretion. On cross-examination she testified:

"Q. Give me, as exactly as you can, in full detail, just what your instructions were.

"A. It is not very long. I have been an organizer for many years. I do not need to have a long set of instructions. A place is unorganized; I am told to go and see what is doing there and see what the chances of organizing are. I am not accustomed to having instructions."

Touching both the question of authority of the organizers and the question of ratification of the particular contract here involved, the following passage in the former opinion of the court in this case seems to me quite pertinent:

"We again note with accentuation the fact that for nine months after the loss of her position the plaintiff was paid a certain sum per week for a period of time and a certain other sum for the residue of the time to January 18, 1936. These payments were in part performance by the defendant of its obligation. Full performance would have required the payment of $18 per week. As far as the act extended it is informative of the construction placed upon the contract by the parties to it."

Instruction J, given by the trial court, reads as follows:

"The court instructs the jury that the constitution of the defendant union can only be considered in this case for the purpose of determining whether the defendant's organizer, Miss Christenson, actually made with the plaintiff the agreement upon which the plaintiff is suing in this case;

but the court further tells the jury that, even though they may believe that Miss Christenson was not authorized by the constitution of the defendant union to make such agreement, yet if she did in fact make it, the defendant is bound by it."

While it is not altogether clear upon just what theory this instruction was given, yet doubtless it was based upon the "apparent authority" doctrine, in the law of agency. This latter is stated thus in 21 Ruling Case Law, p. 854, par. 34:

"The liability of the principal is not limited to such acts of the agent as are expressly authorized or necessarily implied from express authority. All such acts of the agent as are within the apparent scope of the authority conferred on him are also binding· upon the principal, apparent authority being that which, though not actually granted, the principal knowingly permits the agent to exercise, or which he holds him out as possessing. By implication the authority of the agent is enlarged when the principal permits him to do acts not expressly authorized, or which are recognized as valid after they are done."

There being no provisions of the constitution indicating in any other than quite an indefinite way the scope of the authority of those sent out to organize local unions, it would seem the general rules applicable to the relationship of principal and agent govern, rather than those applicable to representatives of bodies operating under a written constitution. The constitution itself in the instant case is silent on this subject save for a few broad provisions outliving the general purpose of the organization, and creating two important executive officers whose powers evidently were meant to be large but the definition of which powers was only in broad and general terms. Hence resort necessarily must be had in considerable measure to some source other than the constitution when a situation is presented requiring the judicial determination of the agent's authority. In all probability it was upon this view of the matter that the trial court gave instruction J.

Certainly the defendant is in no position to claim immunity from responsibility for the acts and engagements of its agents merely because its constitution does not *in haec verba*, or even in general terms, authorize its organizers of local unions to make agreements of the kind here entered into. Unless this be true, then all that is needed to escape liability for the acts of its agents is for an association to adopt a skeleton form of phrasing in the drafting of its constitution.

But even, in the present case, were legal warrant for the instruction open to question, it would seem improbable that the giving of it was prejudicial to the substantial rights of the defendant. Instructions 15, 25, 28, 29 and 30 are distinctly favorable to the defendant's theory of the case, and were well calculated to disabuse the minds of the jurors of any harmfully erroneous impression made by instruction J. By this, of course, I do not mean to imply that that instruction was in any degree erroneous, but simply to call attention to the well-established rule that all instructions are to be read togeher.

In the former opinion this court cited *Pennsylvania Co.* v. *Dolan,* 6 Ind. App. 109, 32 N. E. 802, 51 Am. Rep. 289, which involved a contract similar to the one in question here, and quoted at length from the opinion in that case. I repeat one singularly apposite sentence of the quotation:

"This is, in our estimation, a flagrant breach of contract, and courts exist to a poor purpose if they can give no redress for such a wrong."

This voluntary unincorporated association was organized for the purpose of bringing into its union open shops throughout the country and to eliminate or to lessen what it deemed to be unfair competition. Should it have failed in this, it would have died at home. In accordance with this major purpose, agents were sent abroad. That it was intended that they should hold out inducements to those open shop workers to change their allegiance cannot be questioned. Could they have been expected to say: "Leave the work you have and come with us; maybe you will get

another job and maybe not." They did come to Staunton, and they did do just what it was intended that they should do. In substance and effect they said to the plaintiff: "If you will leave the place you have and join our association we will see that you do not suffer." This was the normal use of power necessarily applied, and this the association itself recognized, for time after time it made payments on account of the contract overwhelmingly established.

I think the judgment is in full accord with the former opinion and should have been affirmed.

BROWNING, J., concurs in this dissent.

*On Rehearing.*

Richmond.

January 8, 1940.

Present, Holt, Hudgins, Gregory, Browning, Eggleston
and Spratley, JJ.

SPRATLEY, J., delivered the opinion of the court.

An opinion was handed down in this case on June 12, 1939. A petition to rehear was duly filed and granted at the September, 1939, session of this court. At the November, 1939, session the case was submitted upon oral argument and briefs and reheard. After careful and mature consideration, the court adheres to its former opinion.

*Former opinion adhered to.*

HOLT and BROWNING, JJ., adhering to their former dissent.